No. 06-3353

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

PITT VESOM,

Appellant,

v.

ATCHISON HOSPITAL ASSOCIATION, et al.

Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**BRIEF OF APPELLANT**

Michael J. Gallagher
Gallagher & Kaiser, LLP
1044 Main Street, Suite 400
Kansas City, MO 64105
(816) 471-4500

Charles D. Kugler
748 Ann
Kansas City, KS 66101
(913) 371-1930

ORAL ARGUMENT REQUESTED        Attorneys for Appellant

TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................2

TABLE OF AUTHORITIES .........................................................................5

PRELIMINARY STATEMENT ....................................................................8

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................................9

STATEMENT OF THE CASE.......................................................................10

STATEMENT OF FACTS ............................................................................11

SUMMARY OF ARGUMENT ......................................................................23

ARGUMENT ..............................................................................................25

Did The Trial Court Err By Granting Summary Judgment
On Vesom's Race Discrimination Claims (Counts I, II & III)
On The Grounds That Plaintiff Submitted Insufficient Evidence
To Establish A Prima Facie Case Of Race Discrimination To Create
A Genuine Issue Of Material Fact For Trial?.........................................26

Did The District Court Err In Granting Summary Judgment
On Vesom's Race Discrimination Claims On The Grounds
There Was No Genuine Issue Of Material Fact On The
Question Of Whether The Defendants' Stated Reason For
Termination Of Vesom's Medical Staff Privileges
Was A Pretext For Discrimination?.......................................................32

        Did The Trial Court Err In Striking The Affidavits
        Of Two Witnesses Who Provided Material Evidence
        That The Stated Reason For Vesom's Termination Of
        His Medical Staff Privileges Was False Because Those
        Witnesses Were Not Identified As Potential Witnesses
        For Trial? ................................................................................34

        Did The District Court Err  In Refusing To Consider

Evidence Presented By Witnesses In Affidavits On The
Grounds They Were Incompetent To Testify About
The Anger And Behavior Of Members Of The
Medical Executive Committee?......................................................37

Did The District Court Err In Refusing To Consider
Documentary Evidence From Vesom's Credentials
File As "Unauthenticated," Which Documents Were
Produced In Discovery Which Were Contained In
Records Maintained By AHA For Purposes Of
Credentialing Vesom? ....................................................................41

Did The District Court Err In Rejecting And Failing To
Recognize Compelling Evidence Of Pretext? ........................................43

Did The Trial Court Err In Granting Summary Judgment
On Vesom's Sherman Act Claim? ............................................................45

Did The Trial Court Err In Granting Summary Judgment
On Vesom's State Law Whistleblower Retaliation Claim On
The Grounds That He Was An Independent Contractor?........................46

Did The Trial Court Err In Granting Summary Judgment
On Vesom's Claim Of Intentional Interference With Business
Relations On The Grounds There Was Insufficient Evidence
That Plaintiff Enjoyed A Business Relationship Or Expectancy
With His Patients In Atchison?................................................................51

Did The Trial Court Err In Granting Summary Judgment
On All Claims On The Grounds That A Waiver Of Claims
Contained In Vesom's Application For Renewal Of His Medical
Privileges In 2003 Barred Claims Based On Subsequent
Violations Of Federal Anti-Discriminatory Statutes,
The Sherman Act And State Law Intentional Torts?..............................52

CONCLUSION ........................................................................................54

REASON ORAL ARGUMENT IS NECESSARY .................................55

CERTIFICATE OF COMPLIANCE........................................................................55

## TABLE OF AUTHORITIES

Case Law:

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51-52 (1974) ..............................54

*Balaklaw v. American Board of Anesthesiology, Inc*., 149 Misc. 2d 11,
562 N.Y.S.2d 360, 362 (N.Y. 1990)........................................................................53

*Bennett v. Coors Brewing Co*, 189 F.3d 1221 (10th Cir. 1999)............................52

*Bryant v. Farmers Insurance Exchange, 432 F.3d1114*
*(10th Cir.(Kan.) 2006)* .............................................................................................33

*Chin Thi Le v. Hy-Vee, Inc.*, 385 F.Supp.2d 1111,1117 (D.Kan. 2005)..............27

*D.L. v. Unified School District #497*, 270 F.Supp.2d 1217
*(D. Kan. 2004)*..........................................................................................................36

*EEOC v. DCI Coca Cola*, 450 F.3d 476 (10th Cir. 2006) .....................................45

*Elmer v. Coplin*, 485 So.2d 171, 177 (La. App. 1986) ...........................................54

*Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210 (10th Cir. 2002)........................25

*Hampton v. Dillards Department Store*, 247 F.3d 1091
*(10th Cir. 2001)* .............................................................................................27, 30, 31

*Hatch v. V.P. Foundation,Inc.*, 990 S.W.2d 126, 140 (Mo. App. 1999)..............54

*Islami v. Covenant Medical Center*, 822 F.Supp. 1361 (D. Iowa 1992) ..............28

*Janda v. Madera Community Hsopital*, 16 F.Supp.2d 1181 (E.D. Cal.1998) .....28

*Jatoi v. Hurst-Euless-Bedford Hospital Authority*,
807 F.2d 1214 (5th Cir.1987).................................................................................28

*Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996) ..........................................25

*Kelly v. Bank Midwest,* 161 F.Supp.2d 1248, 1255 (D.Kan. 2001)......................27

*Kerry Coal Co. v. United Mine Workers,* 637 F.2d 957, 967 (3d Cir.1981) ........38

*Maldonado v. City of Altus*, 435 F.3d 1294 (10th Cir. 2006)..................................44

*Mazzoni Farms, Inc. v. E.I. DuPont & Co.*, 761 So.2d 306, 312 (Fla. 2000) 52, 54

*McElhinney v. William Booth Memorial Hospital*, 544 S.W. 2d 216
(Ken. S.Ct. 1976) ...................................................................................................43

*Nanavati v. Burdette Tomlin Memorial Hospital,* 526 A.2d 697
(N.J. Sup. Ct. 1987) ...............................................................................................43

*O'Neal v. Ferguson Construction Co*., 237 F.3d 1248 (10th Cir. 2001)...............44

*Ortiz v. Norton,* 254 F.3d 889, 893 (10th Cir. 2001) .............................................25

*Parsells v. Manhattan Radiology Group,*
255 F. Supp. 2d 1217 (D. Kan. 2003) ...................................................................49

*Pastran v. K-Mart Corp*., 210 F.3d 1201, 1204 (10th Cir. 2000)...........................42

*Patrick v. Burget* 486 U.S. 94 (1988)....................................................................45

*Plotke v. White,* 405 F.3d 1092, 1103 (10th Cir. 2005)...............................26, 27, 33

*Polson v. Davis,* 895 F.2d 705 (10th Cir. 1990) .....................................................50

*Quenones v. Miller*, 2003 WL 21276429 (S.D.N.Y. 2003) ....................................38

*Reece v. Finch*, 562 So.2d 195, 198-99 (Ala. 1990) ..............................................54

*Rogers v. General Electric Co.*, 781 F.2d 452, 454 (5th Cir. 1986) .....................54

*Sanford v. Crane,* 382 F.3d 1175 (10th Cir. 2004)..................................................52

*Sanjuan v. American Board of Psychiatry & Neurology,*
40 F.3d 247, 250 (7thCir. 1994)............................................................................53

*Smith v. Mission Associates, LTD*, 225 F.Supp.2d 1293 (D.Kan. 2002) ............**27**

*Sprague v. Thorn Americas, Inc*., 129 F.3d 1355, 1359 (10th Cir. 1997) ..........**25**

*Torrez v. Pub. Srv. Co*, 908 F.2d 687 (10th Cir. 1990) ............................................**52**

*Tredrea v. Anesthesia & Analgesia PC,* 584 N.W.2d 276 (Ia. S.Ct. 1998)..........**28**

*Tyler v. RE/MAX Mountain States, Inc*. ., 232 F.3d 808 (10th Cir.2000).....**27, 33**

*U.S. v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826 (5th Cir 1975) ...........**54**

*United States v. Welch,* 745 F.2d 614, 618 (10th Cir.1984) ..................................**38**

*Wabaunsee County v. Umbehr,* 518 U.S. 668 (1996) .............................................**47**

*Zinn v. McKune*, 949 F. Supp. 1530, 1537–38 (D. Kan. 1996) ............................**46**


Other Authorities:


42 U.S.C. §1981.......................................................................................................**26**

FRE 801(d)................................................................................................................**41**

4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 701.02 (2005) ..........................................................................................................**38**


PRIOR OR RELATED APPEALS

There are no prior or related appeals.

PRELIMINARY STATEMENT

This is a civil action commenced by Pitt Vesom, M.D. against Atchison Hospital Association and three physicians on the Medical Executive Committee of the Hospital who voted to deny Dr. Vesom's application for medical staff privileges in February, 2003.  Dr. Vesom contends the denial of his staff privileges resulted from an agreement and conspiracy to fabricate reasons for refusing to continue Dr. Vesom's staff privileges because (i) he is Asian; (ii) he had reported incidents of professional incompetence at the Hospital; and (iii) because defendants had determined to unreasonably restrain trade by preventing or restraining Dr. Vesom from practicing medicine in the community of Atchison. Plaintiff asserts his discrimination claims under 42 U.S.C. §1981, Title VI of the Civil Rights Act of 1964, and 42 U.S.C. §1985; and he asserts additional claims under the Sherman Act, Kansas public policy (whistleblowing), and the tort of intentional interference with business relationships.

Following the entry of a final judgment disposing of all of plaintiff's ("Vesom's") claims against Atchison Hospital Association ("AHA") on September 22, 2006, Vesom filed a timely notice of appeal on October 4, 2006.  This Court has jurisdiction under F.R.A.P. 3(a).

STATEMENT OF ISSUES PRESENTED FOR REVIEW

Did The Trial Court Err By Granting Summary Judgment On Vesom's Race Discrimination Claims (Counts I, II & III) On The Grounds That Plaintiff

Submitted Insufficient Evidence To Establish A Prima Facie Case Of Race Discrimination To Create A Genuine Issue Of Material Fact For Trial?

Did The District Court Err In Granting Summary Judgment On Vesom's Race Discrimination Claims On The Grounds There Was No Genuine Issue Of Material Fact On The Question Of Whether The Defendants' Stated Reason For Termination Of Vesom's Medical Staff Privileges Was A Pretext For Discrimination?

Did The Trial Court Err In Striking The Affidavits Of Two Witnesses Who Provided Material Evidence That The Stated Reason For Vesom's Termination Of His Medical Staff Privileges Was False Because Those that areWitnesses Were Not Identified As Potential Witnesses For Trial?

Did The District Court Err  In Refusing To Consider Evidence Presented By Witnesses In Affidavits On The Grounds They Were Incompetent To Testify About The Anger And Behavior Of Members Of The Medical Executive Committee?

Did The District Court Err In Refusing To Consider Documentary Evidence From Vesom's Credentials File As "Unauthenticated," Which Documents Were Produced In Discovery Which Were Contained In Records Maintained By AHA For Purposes Of Credentialing Vesom?

Did The District Court Error In Refusing To Consider Testimony By Affidavit Of Witnesses Who Were Present When The Individual Defendants, The Chief Executive Officer Of The Hospital And Other Hospital Officials Made Comments Indicating Bias Against Vesom On The Grounds That That Evidence Was Hearsay?

Did The Trial Court Err In Rejecting Evidence That Comparably Situated Members Of The Medical Staff Of AHA Engaged In The Same Kind Of Disruptive Activity That Vesom Was Alleged To Have Engaged In Which Resulted In His Termination Of Staff Privileges?

Did The Trial Court Err In Concluding That The Evidence Created A Genuine Issue Of Fact On The Question Of Whether The Stated Reason For The Termination Of Vesom's Medical Staff Privileges Was False Because The Evidence established That The Decision Was A Post-Hoc

Fabrication, But Was Insufficient To Create A Jury Triable Issue On The Question Of Pretext?

Did The District Court Err In Rejecting And Failing To Recognize Compelling Evidence Of Pretext?

Did The Trial Court Err In Granting Summary Judgment On Vesom's Sherman Act Claim?

Did The Trial Court Err In Granting Summary Judgment On Vesom's State Law Whistleblower Retaliation Claim On The Grounds That He Was An Independent Contractor?

Did The Trial Court Err In Granting Summary Judgment On Vesom's Claim Of Intentional Interference With Business Relations On The Grounds There Was Insufficient Evidence That Plaintiff Enjoyed A Business Relationship Or Expectancy With His Patients In Atchison?

Did The Trial Court Err In Granting Summary Judgment On All Claims On The Grounds That A Waiver Of Claims Contained In Vesom's Application For Renewal Of His Medical Privileges In 2003 Barred Claims Based On Subsequent Violations Of Federal Anti-Discriminatory Statutes, The Sherman Act And State Law Intentional Torts?

STATEMENT OF THE CASE

This is a civil action brought by appellant Pitt Vesom, M.D. against the hospital where he maintained  medical staff privileges for over 20 years.  Dr. Vesom is board certified in cardiology and internal medicine, and throughout his career has never experienced any claim of medical malpractice or been investigated for failure to meet the standard of care required of physicians.  In January, 2003, he submitted his application for renewal of his medical staff privileges at Atchison Hospital Association, which application is required every

two years under the Hospital's bylaws.  The Medical Executive Committee of the Hospital was comprised of five members of the medical staff: defendants Thomas, Goracke and Swayze, and non-defendants Dr. Jones and Dr. Rider.  On February 18, 2003, the Medical Executive Committee denied Dr. Vesom's application.  In this litigation, Dr. Vesom claims that the termination of his medical staff privileges was because of his race, Asian.  In addition, Dr. Vesom claims that the termination of his medical staff privileges violated the Sherman Act and violated Kansas public policy because it was based, in part, on retaliation for his having reported substandard medical care at AHA.  Finally, Dr. Vesom contends the termination of his medical staff privileges amounted to an intentional interference with his prospective business relations with his patients.


On September 22, 2006, a District Judge, Julie A. Robinson, granted defendants' motion for summary judgment on all counts and entered judgment against Vesom.  Vesom appeals to this Court from the final judgment entered in this case on September 22, 2006.

STATEMENT OF FACTS

Background

AHA is a not-for-profit hospital located in Atchison, Kansas.  AplApp. at 471-77.  The Hospital is a community hospital with 24-hour emergency care

serving Atchison and the surrounding area.  AplApp. at 471-76, 478-91.  Atchison

has approximately 12,000 residents.  AplApp. at 922.

A medical doctor must be a member of the medical staff at AHA in order to

admit and treat patients in that facility.  AplApp. at 492-523.  AHA elects officers

for purposes of carrying out the functions of the hospital.  AplApp. at 892.  The

chief of the medical staff (Chief of Staff) , Vice Chief of Staff and Treasurer are

elected.  AplApp. at 892.  The Medical Executive Committee consists of three

elected officers, the immediate past chief of staff and one member at large elected

from the medical staff at its annual meeting.  AplApp. at 497

The Medical Executive Committee is responsible for reviewing physicians

for appointment and reappointment to the medical staff.  AplApp. at 499.  In 2003,

the Medical Executive Committee consisted of Dr. Goracke (Chief of Staff), Dr.

Swayze (Vice Chief of Staff), Dr. Jones (Secretary/treasurer), Dr. Rider (Member

at Large), and Dr. Thomas (past Chief of Staff).  AplApp. at 529-31.

Dr. Vesom is a board certified internist and cardiologist who was first

granted medical staff privileges at AHA in September, 1983.  Vesom was born in

1949 in Thailand; he came to the United States in 1977 and became a US citizen in

1996.  AplApp. at 869.  On February 18, 2003, the Medical Executive Committee

met and voted to not review Dr. Vesom's medical staff privileges.  Under the

Hospital's bylaws, Dr. Vesom was afforded a "fair hearing" in front of other

physicians practicing in the area. Finally, Dr. Vesom's privileges were terminated and he was removed from the hospital staff on April 2, 2004 when the Hospital Board of Directors confirmed the recommendation of the Medical Executive Committee. AplApp. at 878-79.

Review of the Medical Executive Committee's Decision

The defendants argue that evidence of racial bias on the part of the Medical Executive Committee is irrelevant because the decision of the Medical Executive Committee was reviewed by a "fair hearing" panel and ultimately by the Board of Directors of the Hospital. The suggestion that these subsequent stages of review were independent is not supported by the evidence. At the hearing, counsel for AHA admonished the hearing panel that their job was not to investigate or even determine independently whether Dr. Vesom's privileges were properly denied.[1] The defendants also argue that the review of its recommendation by the Hospital's Board of Directors renders any discrimination on the part of the Medical Executive

---

[1] At the hearing before the "Fair Hearing" panel, Andrew Ramirez told the Committee: "then, consistent with the bylaws of the hospital this panel has to rule against Dr. Vesom unless you find that Dr. Vesom has proven, and the burden rests with him to prove, that the Medical Executive Committee's recommendation, adverse recommendation is arbitrary, unreasonable, capricious or not supported by evidence or otherwise unfounded. You may ask what unreasonable, arbitrary or capricious means. There is a definition in the law. The Kansas Supreme Court has defined it as meaning that the information was so -- the decision, rather, was so wide of the mark that its unreasonableness lies outside the realm of fair debate. The Supreme Court's also said that the panel is not to re-weigh the facts or substitute its own judgment even if it would have found it differently." AplApp. at 723-24.

Committee irrelevant.  The Hospital's bylaws dealing with the Board's review of a

recommendation of the Medical Executive Committee provide as follows:

> After all the evidence has been submitted by both parties, the Hearing
> Committee shall rule against the practitioner who requested the
> hearing unless it finds that such person has proved that the adverse
> recommendation of the Committee or Board whose decision prompted
> the hearing was arbitrary, unreasonable or capricious, not supported
> by the evidence, or otherwise unfounded.

AplApp. at 520, ¶ 5(i)(2).

Likewise, review of the Medical Executive Committee's decision to

terminate Dr. Vesom's staff privileges was not subjected to an independent review

and evaluation by the Hospital Board.  According to the AHA bylaws, the review

of the Board of Directors is confined to the record presented to the "fair hearing"

panel, and the only grounds for appeal are (i) the prejudicial failure of the Hearing

Committee to comply with the applicable provisions of the Medical Staff Bylaws;

(ii) arbitrary, capricious or biased actions of the Hearing Committee; or (iii) actions

of the Hearing Committee not supported by the evidence.  AHA Bylaws, Appendix

C §(8)(b); AplApp. at 521.

The termination of Dr. Vesom's staff privileges was purportedly based upon

33 separate allegations of wrongdoing contained in a chart which was prepared by

AHA after the decision to deny Vesom's medical staff privileges was made.

AplApp. at 1295-96.  The first time Dr. Vesom became aware of the vast majority

of these so-called "charges" was when the chart was delivered to his legal counsel,

over four months after he was informed that his privileges would not be renewed. AplApp. at 730.

Dr. Vesom and another staff physician, Dr. Ware, had asserted complaints over the way the hospital's peer review process handled a case of maternal morbidity with respect to the actions of Dr. Thomas.  AplApp. at 728-29 and 1278. On January 3, 2003, Dr. Vesom and Dr. Ware met with the chief executive officer of the hospital, Virgil Bourne, and Dr. Goracke.  Id.  On January 22, 2003, Dr. Vesom and Dr. Ware raised these complaints in a letter to the Board of Directors of the Hospital.  AplApp. at 1171-72.  One day later, on January 23, 2003, a special meeting of the Board of Directors was convened to discuss "pressing medical staff issues."  The meeting was attended by Dr. Goracke, Virgil Bourne, and Andrew Ramirez, legal counsel for the hospital.  The minutes of the meeting do not disclose what was discussed but the only action taken by the board was to vote to terminate the agreement with Dr. Ware with or without cause.  AplApp. at 1177. On February 18, 2003, both Dr. Ware and Dr. Vesom were informed that the Medical Executive Committee had decided not to renew their staff privileges, based on virtually identical assertions that the physicians were "disruptive." Compare AplApp. at 686-88 and AplApp. at 1174-76.  On February 24, 2003, the Board of Directors meet with Dr. Goracke, Virgil Bourne and Andrew Ramirez. The minutes record the following:

The Executive/Credentials Committee further informed the Board of their recommendation to give David Ware, MD, OB/GYN, notice of Termination of Provisional Active Staff Status and Privileges effective March 18, 2003. They also informed the Board of their recommendation to notify Pitt Vesom, MD, Cardiology, of Termination of Active Staff Privileges effective March 18, 2003.

EXECUTIVE SESSION

It was moved and seconded that the Board meet in executive session with members of the hospital peer review committee and hospital counsel to discuss matters deemed privileged under the peer review privilege and the attorney/client privilege. Thereafter the Board met in executive session with the risk manager and hospital counsel in executive session.

AplApp. at 1179.

Dr. Thomas, a member of the Executive Committee, was angry with Dr. Vesom because Dr. Vesom wanted an outside review of a maternal morbidity and mortality case (Blackmon) which involved Dr. Thomas' patient and because Dr. Vesom and Dr. Ware had disputed the validity of the medical review. AplApp. at 1293-94. Dr. Goracke and Dr. Swayze were also angry with Dr. Vesom for raising questions about the quality of care at the hospital in the meeting of January 3, 2003 with the CEO and Dr. Goracke. AplApp. at 1293-94. Thomas, Swayze and Goracke decided to deny Dr. Vesom's application for renewal of staff privileges immediately after receiving the January 22, 2003 letter from Dr. Vesom. AplApp. at 1293-94. After the decision not to renew Dr. Vesom's staff privileges was made

by the Executive Committee, the Committee sought counsel to determine the best way to support their decision.  AplApp. at 1294.

The Committee reviewed Dr. Vesom's credential file and settled on using certain anecdotal notes which were made without informing Dr. Vesom, as required by the Bylaws, by characterizing Dr. Vesom as a disruptive physician. AplApp. at 1294.

The complaints of Dr. Vesom were investigated by the KDHE, which investigation resulted in a finding that most of Dr. Vesom's complaints about substandard care were valid. AplApp. at 1294, 1279, 1238-45 and 1089-93.

At the time his staff privileges were terminated, Dr. Vesom had thousands of patients in the Atchison area; without a local hospital to which he could refer patients, his ability to practice medicine in the Atchison area was essentially destroyed. AplApp. at 1278.  Accordingly, the actions of AHA denying him staff privileges have forced him to relocate to Poplar Bluff, Missouri and lose the good will he developed in Atchison from over 20 years of practice. AplApp. at 1278.

Evidence of Discrimination

Throughout his 20 year experience at AHA, Vesom encountered collective resistance from the medical staff to his social and professional interactions and activities; he and his wife were never invited to or included in social events. AplApp. at 1279.  Most of the medical staff refused to refer patients to him, even

though he was the only board certified internist and cardiologist in town.  AplApp.

at 1279. Vesom's wife, who is Asian, is a board certified pathologist; but she was

never able to obtain staff privileges at AHA.  AplApp. at 1280.  At no time was Dr.

Vesom advised that AHA was keeping a file listing his alleged "disruptive

behavior."  AplApp. at 1281.

When AHA produced Vesom's Credentials File in discovery, Vesom learned

that the documentation of alleged disruptive behavior revealed  multiple instances

in which important exculpatory documents, and even altered documents, were used

from his Credentials File to present AHA's evidence to the Fair Hearing

committee.  AplApp. at 1283-91; 303-17.

Dr. Ware, whose staff privileges were terminated the same day as Vesom's

privileges were not renewed, testified that soon after he arrived at AHA, the CEO,

Virgil Bourne, told Dr. Ware to "watch out for [Dr. Vesom].  He'll stab you in the

back!"  AplApp. at 1306.  Dr. Thomas, a member of the Medical Executive

Committee, told Dr. Ware that he hated Dr. Vesom and that it was no secret he

hated him.  AplApp. at 1306.  Likewise, Dr. Goracke, told Dr. Ware that he had an

open hatred for Dr. Vesom which was shared by many members of the medical

staff.  AplApp. at 1306.  Dr. Ware observed that the feelings and attitudes

expressed against Dr. Vesom were based upon the fact that he was a foreign-born

doctor.  AplApp. at 13 of six.  Dr. Ware further testified that he had informed

Kathy Butler, the Hospital's Risk Management Officer, that he and Dr. Vesom planned to contact regulatory agencies to complain about the poor quality of health care at AHA several months before Vesom's staff privileges were terminated. AplApp. at 1307.

Dr. Rider testified that he was personally present at the meetings of the Medical Executive Committee in which the decision to terminate Dr. Vesom's privileges was made. AplApp. at 1295. There were two meetings at which the medical executive committee discussed renewal of Dr. Vesom's staff privileges, one at the Bellevue Country Club in Atchison attended by AHA's legal counsel and a second formal meeting at the Hospital on February 18, 2003. AplApp. at 1295-96. Dr. Rider testified there was an open hostility expressed against Dr. Vesom at the Bellevue Country Club meeting, where the determination was made by Dr. Goracke, Dr. Swayze and Dr. Thomas to get rid of Vesom. AplApp. at 1295-96. At that meeting, AHA legal counsel informed the Medical Executive Committee that it could act with immunity if it would cloak the decision in terms of hospital bylaws regarding disruptive behavior. AplApp. at 1295-96. Dr. Rider testified expressly that at no time during any meeting of the Medical Executive Committee was any discussion had of Vesom's disruptive behavior. AplApp. at 1295-96. It was only after the decision had been made formally that an effort was made to pull together documentation in the form of the so-called "AHA Medical Executive

Committee Exhibits," which were used at the "fair hearing" provided to Dr.
Vesom. 1295-96. Further, Dr. Rider testified that the animus directed toward Dr.
Vesom by members of the MEC was not the result of any disruptive behavior on
the part of Dr. Vesom. AplApp. at 1296.

Rosetta Birch, a former respiratory therapist and medical records clerk at
AHA, testified that she became acquainted with Dr. Vesom over the years of his
employment. AplApp. at 1297. Ms. Birch testified that Dr. Vesom always treated
her and others with courtesy and respect and was never disruptive in her
experience. AplApp. at 1297. One of the incidents which AHA alleges as an
instance of disruption involved the care by Dr. Vesom of Ms. Birch's mother. That
incident was documented by a memo dated October 23, 2002 [AplApp. at 658] in
which Mr. Bourne stated that Ms. Birch had complained bitterly regarding Dr.
Vesom's treatment of her mother. Ms. Birch testified that Mr. Bourne's account of
the incident was false and that she agreed completely with the care provided Dr.
Vesom in that instance. AplApp. at 1297. Finally, Ms. Birch testified that Kathy
Butler, AHA's Risk Management Officer, remarked on a number of occasions that
Dr. Vesom "needs to just go back were he came from." AplApp. at 1299.

Kathy Jackson, a registered nurse, worked at AHA from 1969 until
September 28, 2005. In the last 16 years of her employment she was the head
nurse in the emergency room where she had frequent interaction with Dr. Vesom.

AplApp. at 1300.   In her frequent interactions with Dr. Vesom, she never encountered any problems with his behavior.   AplApp. at 1300.   Ms. Jackson testified that, in contrast, the administration of AHA, which was controlled by a "in-group" of family practice physicians, including Dr. Thomas, Dr. Jones and Dr. Wallace, always reacted adversely to criticism and often retaliated against those who criticized hospital procedures and standards of care.   AplApp. at 1300-01. During her many years of service, and literally hundreds of interactions with Dr. Vesom's care for patients, Ms. Jackson never found him to be abusive of the staff for the patient; he never disrupted the flow of care to a patient.   AplApp. at 1301. Ms. Jackson testified that during her years of service in the emergency room,  she observed on many occasions that Dr. Vesom obtained miraculous results in treating his patients, and that his removal from the staff of AHA diminish the quality of health care in the community.   AplApp. at 1301-02.

Disparity in Treatment of Dr. Vesom as Related to Caucasian Staff Members

Documents obtained in discovery from the personnel files and Credentials Files of Caucasian physicians on staff reveals significant disparities between the manner in which Dr. Vesom was treated and the general practice of the Hospital to ignore much more serious conduct of white doctors.  Examples include:

- A white physician who was given preference for a committee chairmanship over Dr. Vesom by Dr. Thomas when he was chief of staff had significant

behavioral problems including (i) appearing in the hospital to treat patients under the influence of alcohol; (ii) acting inappropriately, using a loud voice, using profanity while working at the hospital; (iii) failing the exam to be board certified on four occasions; and (iv) working at the hospital while under a diagnosis of a significant mental disorder. See Confidential Appendix[2] at 1-2, and 22-30. No disciplinary action was ever taken against this doctor.

- One white member of the medical executive committee that voted to terminate Dr. Vesom's privileges because he was "disruptive" was documented to have: (i) yelled and cursed at staff members who complained they were offended; (ii) engaged in over 30 documented incidents concerning his treatment and behavior, including swearing outside a patient's room; and (iii) found by the Kansas Department of Health and Environment to have performed a vaginal examination on a patient, a procedure which he was not authorized to perform. Others noted that this physician remained in the natal delivery room unnecessarily, causing patients and one female staff physician to be uncomfortable with his presence. Confidential Appendix at 2-3 and 6-22.

---

[2] A separate appendix containing confidential documents has been filed with this Court in camera. Reference to the materials in that in camera filing are called the "Confidential Appendix.

- Another white physician on the medical executive committee which terminated Dr. Vesom's credentials was documented by the hospital to have stolen a staff member's shoes, but was never disciplined. Confidential Appendix at 3 and 30.

## SUMMARY OF ARGUMENT

This is a civil action commenced by Vesom against Atchison Hospital Association ("AHA") and three individual physicians on the medical staff at AHA who voted to terminate the staff privileges of Vesom on February 18, 2003. Vesom was originally granted staff privileges at AHA in 1983, and he developed a thriving medical practice in the Atchison, Kansas medical community. Vesom's evidence shows that members of the medical staff at AHA were openly hostile to him throughout the course of his tenure at AHA. Vesom left the medical staff of AHA in 1996 to return to his native Thailand following his father's death. Upon returning to Atchison in 1998, Vesom experienced significant difficulty in reestablishing his medical practice and staff privileges, notwithstanding an unblemished record of medical service to the community. Not once in Dr. Vesom's many years of medical practice has a complaint of medical negligence or incompetence been asserted against him. After many months of delays, Dr. Vesom was again granted staff privileges at AHA, but many restrictions were imposed on

him and the hostility directed toward him by members of the medical staff increased.

The Complaint in this civil action alleges that the individual defendants who occupied positions on the Medical Executive Committee entered into an agreement and conspiracy to fabricate reasons for refusing to continue Vesom's staff privileges at AHA. Vesom presented evidence that the three individual defendants, having previously decided that they would vote to not renew Vesom's staff privileges, fabricated a reason to terminate Vesom from the hospital staff. The testimony of Dr. Rider, another member of the Medical Executive Committee, demonstrates that the three individual defendants first decided they would vote to terminate Vesom's privileges, and then met at the Bellevue Country Club in Atchison to settle on a "legal basis" for terminating Dr. Vesom. Ultimately, Vesom's privileges were terminated on February 18, 2003, allegedly on the grounds that he was a "disruptive" physician. The evidence will show that AHA surreptitiously maintained a "file" on Vesom, in which hospital insiders kept a paper record of alleged "infractions" or instances of alleged disruptive behavior, which were then used as the putative basis for the termination of staff privileges. The evidence reveals a long-standing plan to terminate Vesom's privileges.

The complaint asserts claims under federal civil rights statutes for discrimination against Dr. Vesom because of his national origin, antitrust violations, whistleblower protections and intentional interference with business relations.

The record presented in the District Court establishes that there are genuine issues of material fact for trial on all of the claims asserted, and the District Court erred in granting summary judgment in this case.

ARGUMENT

Standard of Review

The Court of Appeals reviews the district court's grant of summary judgment de novo, applying the same legal standard which should be used by the district court. ***Garrett v. Hewlett-Packard Co.***, **305 F.3d 1210, 1216 (10th Cir. 2002);** ***Ortiz v. Norton***, **254 F.3d 889, 893 (10th Cir. 2001)**. The Court of Appeals must view the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. ***Garrett, supra***, **305 F.3d at 1212; *Ortiz* supra 254 F.3d at 893; *Sprague v. Thorn Americas, Inc*., 129 F.3d 1355, 1359 (10th Cir. 1997); *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996)**. As this Court observed in ***Plotke v. White*, 405 F.3d 1092, 1103 (10th Cir. 2005):**

> It is not the purpose of a motion for summary judgment to force the judge to conduct a "mini-trial" to determine the defendant's true state of mind. So long as plaintiff has presented evidence of pretext (by demonstrating that the defendant's proffered a nondiscriminatory

reason is unworthy of belief) upon which a jury could infer discriminatory motive, the case should go to trial. Judgments about the intent are best left for trial and are within the province of the jury.

## QUESTIONS PRESENTED ON APPEAL

**Did The Trial Court Err By Granting Summary Judgment On Vesom's Race Discrimination Claims (Counts I, II And III) On The Grounds That Plaintiff Submitted Insufficient Evidence To Establish A Prima Facie Case Of Race Discrimination To Create A Genuine Issue Of Material Fact For Trial?**

The District Court held that plaintiff failed to establish a prima facie case of race discrimination in violation of 42 U.S.C. §1981 and Title VI of the Civil Rights Act of 1964, apparently because the District Court believed that the bylaws of the Hospital do not create a contract for continued employment and, accordingly, none of plaintiff's contract rights were implicated in the decision to terminate his staff privileges. AplApp. at 440-446.[3]    In the motion for summary judgment, defendants have asserted that because this is not a case involving an employer and employee, the burden-shifting analysis of *McDonnell Douglas* should not apply. Defendants' argument fails to recognize that the model of proof which raises an inference of discrimination is a judicial rule created because of the inherent difficulty of proving discriminatory animus and intent. The origin of the rule is grounded in logic and reasoning, not a narrow principle of employment law.

---

[3] The District Court's opinion does not decide or suggest why Vesom's evidence is insufficient to make a prima facie case under Title VI.

Indeed, the courts routinely follow the ***McDonnell Douglas*** model of proof in cases where non-employees or independent contractors claim race discrimination. ***Hampton v. Dillards Department Store***, **247 F.3d 1091, 1107 (10th Cir. 2001); *Tyler v. RE/MAX Mountain States, Inc*., 232 F.3d 808, 812 (10th Cir. 2000); *Chin Thi Le v. Hy-Vee, Inc.,* 385 F.Supp.2d 1111,1117 (D.Kan. 2005); *Smith v. Mission Associates, LTD*, 225 F.Supp.2d 1293, 1301 (D.Kan. 2002); *Kelly v. Bank Midwest,* 161 F.Supp.2d 1248, 1255 (D.Kan. 2001).**

Apparently, the District Court held that the burden-shifting model of proof articulated in ***McDonnell Douglas*** should apply [AplApp. at 441], the District Court granted summary judgment on the basis that a prima facie case was not made even though defendants did not challenge the ability of plaintiff to establish a prima facie case in their summary judgment motion. Vesom did make a prima facie showing of discrimination by showing: (i) he is Asian (ii) he was specially qualified for the position he held [he did the job for over 20 years]; (iii) his medical staff privileges were terminated; (iv) the termination occurred under circumstances which give rise to an inference of discrimination. See ***Plotke v. White***, **405 F.3d 1092, 1100-01 (10th Cir. 2005)**. Under the ruling in ***Plotke*** plaintiff is not required to show that he was replaced with a non-minority doctor.

The assertion that no contract exists between staff positions and the hospital is puzzling in view of defendants' assertion at least eight times that the Bylaws

impose "agreements" and "contractual obligations" on the physicians admitted to the staff.  See, Defendants' Statement of Uncontroverted Facts at ¶7, 13, 17, 23, 24, 25, 145 and 210 [AplApp. at 109-11, 136 and 151-52..

First, defendants' assertion that the Bylaws of a Hospital do not constitute a contract between the hospital and medical staff is contrary to established law.  See 41 C.J.S. Hospitals, §16: "A hospital's medical staff bylaws constitute a contract between the hospital and its medical staff . . . ."  Many courts have recognized the right of physicians denied staff privileges to assert claims of race discrimination under §1981 and 42 U.S.C. §1985(3) where a conspiracy is alleged. **See, e.g. *Jatoi v. Hurst-Euless-Bedford Hospital Authority*, 807 F.2d 1214, 1219 (5th Cir. 1987)**.  **See also *Islami v. Covenant Medical Center*, 822 F.Supp. 1361, 1370 (D. Iowa 1992); *Janda v. Madera Community Hsopital*, 16 F.Supp.2d 1181, 1186 (E.D. Cal. 1998).**

The District Court cites ***Tredrea v. Anesthesia & Analgesia PC,* 584 N.W.2d 276 (285-87 )(Ia. S.Ct. 1998)**, for the proposition that the holding of the District Court in ***Islami*** was incorrect because Hospital Bylaws do not create an enforceable contract.  The issue in ***Tredrea*** concerned the enforceability of an exclusive agreement between a hospital and a group of anesthesiologists, and the Court merely held that hospital bylaws could not constitute an agreement for continued exclusive rights to medical staff    Privileges because such an

interpretation would interfere with the ultimate authority of the Board of Directors of the Hospital.   Rather than overrule *Islami*, the situation in that case from circumstances involving the loss of staff privileges due to alleged misconduct on the part of physician.  The Court observed:

> The right to continue to staff privileges is not expressed in the bylaws, and for that reason this case must be distinguished from *Islami,* a case in which plaintiff complained that he had the express right under the bylaws to receive notice and a hearing before suspension. In this case, there is also a vast difference between a doctor's loss of staff privileges through some form of disciplinary sanction, such as in Islami, and the doctor's "loss" of staff privileges to a refusal to comply with the terms of the staff reorganization agreement.  A California case involved a very similar question involving a doctor who had failed to become a part of a departmental reorganization.  The Court held that he did not have the right to continued employment.  In the process, the Court stated that where a doctor loses or does not attain staff privileges because of a professional inadequacy or misconduct, the professional reputation of that doctor is at stake.   In that circumstance, his or her ability to become a member of the staff of other hospitals is severely impaired.

**584 N.W.2d at 286**.

The District Court argued that the staff bylaws could not constitute a contract because the hospital receives no consideration for the agreement of the physician to treat patients at the hospital.  Plainly, without staff physicians, a hospital would quickly go out of business because it could not deliver medical services.  It may not be argued seriously that admission to a medical staff under a rigid set of regulatory guidelines benefits both the physicians on staff and the hospital, and termination of that relationship affects adversely the right of the

physician to engage in his chosen profession.  Perhaps a physician does not have a right to continued staff privileges as the court in Iowa observed, but denial of staff privileges for a physician impairs significantly the ability to practice his profession not just at the hospital where privileges were denied, but at other institutions because of the adverse effects of reporting a staff termination to the National Practitioners Data Bank.

An employee-at-will has no right to continued employment or does he or she have a right to be hired in the first place.  Nevertheless a denial or termination of employment-at-will because of a person's race is undisputedly a violation of 42 U.S.C. §1981.  The District Court's distinction of this case from ordinary employment situations is irrational.

The District Court acknowledged the applicability of ***Hampton v. Dillard Department Stores, Inc.*, 247 F.3d 1091 (10th Cir. 2001)** to this case in deciding the appropriate articulation of the prima facie case.  Opinion at 30.  In ***Hampton***, this Court affirmed a judgment for a department store customer for actual and punitive damages under 42 U.S.C. §1981, holding that the customer had a sufficient "contract" interest in a coupon for the purchase of perfume to protect that contract right from interference because of race.  Dr. Vesom engaged in the practice of medicine for over 20 years in the Atchison community, and his loss of staff privileges at Atchison Hospital Association cost him his medical practice in

that community and forced them to move to Poplar Bluff Missouri to continue this practice.  Moreover, the decision to terminate Vesom's staff privileges interfered with his ability to contract, perform services for, and be paid by the thousands of patients he had developed over his 20 year history at the Hospital.  Can it be argued seriously that he had a lesser contract right to engage in his profession than a retail customer has to purchase perfume?

The District Court found that it was compelled to apply the articulation of the prima facie case by this Court's holding in ***Hampton***.  In fact, this Court held:

> (1) that the plaintiff is a member of a protected class;
> (2) that the defendant had the intent to discriminate on the basis of race; and
> (3) that the discrimination interfered with a protected activity as defined in § 1981.
>
> *See Reynolds v. School Dist. No. 1, Denver, Colo.,* 69 F.3d 1523, 1532 (10th Cir.1995) ("Section 1981 prohibits racial discrimination in 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.' ") (quoting 42 U.S.C. § 1981); *see also Bellows v. Amoco Oil Co.,* 118 F.3d 268, 274 (5th Cir.1997) (listing three elements); *Morris v. Office Max, Inc.,* 89 F.3d 411, 413 (7th Cir.1996) (applying elements to retail transaction).  These elements "are flexible and are not to be applied rigidly." *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 530 n. 2 (10th Cir.1994).

**247 F.3d at 1102**.  The District Court selected a prima facie case model drawn from a retail shopping case.  As  this Court observed, the elements of the prima facie case are flexible and should be applied to the facts of that particular case.  Because  the  termination  of  a  20-year  staff  physician  is  much  more  closely

associated with the termination of employment, Vesom suggests the ordinary

articulation of the prima facie case used in employment cases should be applied

here.  There is no question Vesom established a prima facie case of discrimination.

**Did The District Court Err In Granting Summary Judgment On Vesom's Race Discrimination Claims On The Grounds There Was No Genuine Issue Of Material Fact On The Question Of Whether The Defendant's Stated Reason For Termination Of Vesom's Medical Staff Privileges Was A Pretext For Discrimination?**

Defendants assert that they had a legitimate, nondiscriminatory reason for

terminating the medical staff privileges of Dr. Vesom.  They state that Dr. Vesom

was a "disruptive physician" which justified the decision to terminate his

privileges.  AplApp. at 198.  There is ample evidence to establish that the stated

reason for Dr. Vesom's termination is false and is a pretext for discrimination.  As

the Tenth Circuit has stated repeatedly:

> pretext may be shown by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." ***Morgan v. Hilti, Inc*., 108 F.3d 1319, 1323 (10th Cir.1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir.1996)).** A plaintiff can make a showing of pretext with evidence that the defendant's stated reason for termination was false. ***Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir.2000).**

Plaintiff is not required to demonstrate pretext with respect to every issue

raised by the defendant as its "legitimate, nondiscriminatory reason" for its action.

Where plaintiff casts doubt on a significant number of the multiple reasons or

bases for its action, the trier of fact is entitled to question the defendant's credibility and reject even those reasons which are not discredited.  See ***Bryant v. Farmers Insurance Exchange*, ____ F.3d ____, 2005 WL 3475772 (10th Cir.(Kan.) 2006) at \*10**; ***Tyler v. RE/MAX Mountain States, Inc*. ., 232 F.3d 808, 814 (10th Cir.2000).**  Plaintiff has challenged the truthfulness and validity of virtually every instance relied upon by defendants as evidence of Dr. Vesom's "disruptive" behavior, precluding summary judgment.

The testimony of Dr. Rider provides evidence that the timing of the decision to terminate Dr. Vesom is inconsistent with the defendants' claims.  According to the sworn testimony of Dr. Rider, a member of the Medical Executive Committee and a participant in the meeting and discussions leading up to the termination of Dr. Vesom, the other four members of the MEC decided to terminate Dr. Vesom before there was any discussion of the grounds for terminating him and that the motive of the others on the Committee had nothing to do with assertions that he was disruptive.  As the Tenth Circuit observed in ***Plotke*, 405 F.3d at 1104:**

> The conflicting evidence concerning the timing of Dr. Morris' decision to fire Dr. Plotke coupled with the conflicting evidence regarding the reasons Dr. Morris decided to fire her raise credibility issues for the fact finder.   As the Supreme Court has reaffirmed,
>
> [p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. . . . In appropriate circumstances, the trier of fact can reasonably infer from

the falsity of the explanation that the employer is assembling to cover up a discriminatory purpose.

*Reeves,* **530 U.S. at 147, 120 S.Ct. 2097.**   If Dr. Morris' testimony concerning his timing and reasoning for terminating Dr. Plotke is "unworthy of credence," a reasonable jury could infer from "the falsity of [his] explanation" that Dr. Morris is "assembling to cover up a discriminatory purpose." *Id.*

Inexplicably, the District Court found insufficient evidence of pretext to make a genuine issue of material fact for trial.  Yet, the trial court found expressly that "even though plaintiff provides evidence of ad hoc fabrication of the reasons behind the denial of his reappointment, the Court finds that he  failed to create a question of fact for the jury that race motivated the decision."  Appendix at 450. An "ad hoc fabrication" by a defendant employer of the stated reason for termination is plainly false and pretextual and ample evidence of mendacity. Clearly, the District Court erred in granting summary judgment in this case.

> **Did The Trial Court Err  In Striking The Affidavits Of Two Witnesses Who Provided Material Evidence That The Stated Reason For Vesom's Termination Of His Medical Staff Privileges Was False Because Those Witnesses Were Not Identified As Potential Witnesses For Trial?**

The District Court struck the affidavits of Rosetta Burch and Kathy Jackson on the grounds that these two individuals were not listed as potential trial witnesses on February 1, 2005--a date more than one year before defendants filed their motion for summary judgment and 25 months before this case was set for trial. The affidavits of Ms. Birch and Ms. Jackson were submitted to the Court and the

defendant's 14 months in advance of trial.  See Docket Entry 198, AplApp. at 23.

The District Court held specifically that Vesom was not justified in failing to

disclose information and that the defendants were prejudiced by this failure to

disclose a material witness.

Because 14 months remained between the time  these witnesses were

disclosed in the trial of this matter, defendants could hardly be prejudiced by this

quote newly-discovered" evidence.  It should be noted that both Ms. Birch and Ms.

Jackson were current employees of the AHA during the discovery phase of this

litigation and unlikely to cooperate with the plaintiff in this matter.  Only after they

no longer work for AHA were they willing to come forward and testify.  Vesom

suggests the ruling of the District Court exalts technicalities and disclosure

deadlines over reaching a just result.  Defendants had ample time to depose these

witnesses before trial and, indeed, could have sought to take their depositions

before filing their Reply Suggestions on the Motion for Summary Judgment on

May 26, 2006, more than four months after they had learned of the identity of

Jackson and Birch and a detail of their testimony.

In ***D.L. v. Unified School District #497***, **270 F.Supp.2d 1217, 1236-37 (D.**

**Kan. 2004), rev.on other grounds 392 F.3d 1223 (10th Cir.  2004)**, the Court

articulated the generally accepted rule that affidavits submitted in support or

opposition to a motion for summary judgment may be considered, even where the

affiants are not listed as potential trial witnesses.  The Court held:

> The court notes that while Federal Rule of Civil Procedure 56(e)
> requires that affidavits must be supported by admissible evidence, it
> does not require that affiants be listed as witnesses for trial.  *See, e.g.,*
> *Schmitt v. Beverly Health & Rehab. Services,* 993 F.Supp. 1354, 1359
> (D.Kan.1998);  *Taylor v. St. Louis Sw. Ry. Co.,* 746 F.Supp. 50, 53
> (D.Kan.1990).   In their motion to strike the affidavit of Cindy Harvel,
> which the court will consider later in the opinion, defendants attempt
> to distinguish *Schmitt* and *Taylor* on the grounds that the affidavits at
> issue in those cases either were not essential to the court's decision,
> *Schmitt,* 993 F.Supp. at 1360, or because the party moving to strike
> would have incurred no prejudice, *Taylor,* 746 F.Supp. at 53.
> Defendants argue that the court should reject these cases because
> defendants would incur prejudice in this case if Ms. Urbom and Ms.
> Harvel's affidavits were admitted.    Further, defendants claim that
> Rule 56(e) limits the testimony that courts may consider upon
> summary judgment to that of affiants who will also testify at trial.
>
> After having considered defendants' arguments, the court believes that
> *Schmitt* and *Taylor* are persuasive authority.  Rule 56(e) provides that
> "[s]upporting and opposing affidavits ... shall set forth such facts as
> would be admissible in evidence."   The interpretation of Rule 56(e)
> advanced by the *Schmitt* and *Taylor* courts is supported by the clear
> language of the rule.  Rule 56(e) "focuses on the  quality of the
> information contained in the affidavit and the affiant's relationship to
> that information, not whether the affiant will be available to testify at
> trial."  *FDIC v. Horn,* 751 F.Supp. 186, 188 n. 1 (D.Colo.1990);  *see*
> *also Paolello v. Marco,* No. 96-C-2793, 1997 WL 280654 at *4
> (N.D.Ill. May 22, 1997) (denying motion to strike affidavit of witness
> not listed as a potential trial witness).   Defendants' motion to strike
> Ms. Urbom's affidavit for purposes of consideration on summary
> judgment is denied.

The District Court had no grounds to strike the affidavits of Birch and Jackson and erred in refusing to consider their testimony in connection with the District Court's ruling on the motion for summary judgment.

### Did The District Court Err In Refusing To Consider Evidence Presented By Witnesses In Affidavits On The Grounds They Were Incompetent To Testify About The Anger And Behavior Of Members Of The Medical Executive Committee?

Without specifying which portions of the affidavits submitted by Vesom in opposition to the motion for summary judgment would be ignored, the District Court found that certain portions of the declarations of Vesom, Dr. Rider, and Dr. Ware would not be considered because they contained conclusions or were founded on inadmissible hearsay. Appendix at 420-25. For example, the District Court found that the great majority of Dr. Ware's declaration was founded on inadmissible hearsay and that Dr. Rider's declarations contained inpermissible conclusions when characterizing the behavior of other members of the Medical Executive Committee as "angry" or "hostile" or "retaliatory."

In fact, Federal Rule of Evidence 701 permits a lay witness to express opinions and conclusions regarding things such as emotional state and manner of behavior as appropriate shorthand for personal observation. The District Court Court erred in its interpretation of F.R.E 701. See *Quenones v. Miller*, **2003 WL 21276429 (S.D.N.Y. 2003)**, where the Court discussed the ability of lay witnesses to testify concerning their impressions, as follows:

Quinones asserts that Morris erred by failing to object to Scarlett's "conclusory" testimony that the man talking to her boyfriend prior to the shooting was "upset." The Court disagrees, as this appears to be the sort of "lay opinion" that courts commonly deem admissible. *See Blake v. People,* 73 N.Y. 586 (1878); *People v. Roldan,* 211 A.D.2d 366, 369, 627 N .Y.S.2d 1014, 1016 (1st Dep't 1995) ("lay opinion is properly received in evidence. Familiar examples, given in Richardson, *Evidence* § 364 (Prince 10th ed), are whether a person is angry or jesting, vigorous or feeble, sober or intoxicated, the estimated age of another, the genuineness of handwriting, the identity of a briefly seen perpetrator or his telephone voice, etc."), *aff'd,* 88 N.Y.2d 826, 643 N.Y.S.2d 960 (1996); 33 N.Y.Jur.2d *Criminal Law,* § 1987 (2002) ("A lay witness may testify as to his impressions of the emotional state of another person, including his observations as to whether such person seemed nervous, excited, angry, or feigning anger."); *see also* 4 *Weinstein's Federal Evidence* § 701.02 at p. 701-6 (2d ed.2003) (same rule for lay opinion under Federal Rules of Evidence.

See also*, **United States v. Welch,** 745 F.2d 614, 618 (10th Cir.1984)* (lay opinion testimony that defendant was "angry" but appeared "lucid" was admissible to counter defense that defendant could not form specific intent to carry out threats of violence); **Kerry Coal Co. v. United Mine Workers,** 637 F.2d 957, 967 (3d Cir.1981) (testimony that individuals were "nervous and afraid" was shorthand report of witness's observations of reactions); **4 Jack B. Weinstein & Margaret A. Berger,** *Weinstein's Federal Evidence* § 701.02 (2005) (approving testimony that a person was "lucid" or "coherent" as an acceptable "shorthand" for the witnesses' observations of the person's outward physical condition).

The District Court likewise rejected the affidavits of Dr. Ware and Dr. Rider because they were based on inadmissible hearsay. Here are some examples of the "inadmissible hearsay" the District Court rejected from these affidavits:

Dr. Ware:

- Virgil Bourne, the chief executive officer of Atchison Hospital Association and the person who wrote the letter terminating Dr. Vesom's staff privileges, told Dr. Ware to "watch out for Dr. Vesom, he will stab you in the back." AplApp. at 1306.

- Ryan Thomas, chief of staff, a defendant in this case, and a member of the Medical Executive Committee which voted to terminate Dr. Vesom's privileges told Dr. Ware that he "hated" Dr. Vesom and that the "it is no secret I hate Dr. Vesom." AplApp. at 1306.

- Dr. Douglas Goracke, a defendant in this case and a member of the Medical Executive Committee which voted to terminate Dr. Vesom's staff privileges, made disparaging comments about Dr. Vesom to Dr. Ware on the community golf course. AplApp. at 1306.

- Based on his observations and interactions with the medical staff, Dr. Ware formed the opinion that Dr. Vesom and his wife were ostracized and not included in social events of the medical staff in part because he was a

foreign-born doctor and was not part of the "inner circle" of physicians. AplApp. at 1306.

- On February 1, 2003, several weeks before the vote to terminate the staff privileges of Dr. Vesom and Dr. Ware, Dr. Ware in form to Dr. Goracke that he and Dr. Vesom felt obligated to report to appropriate regulatory agencies problems with meeting the quality of care standard Atchison Hospital Association, and Dr. Goracke became very angry when formed of this plan. AplApp. at 1307.

Dr. Rider:

- Dr. Rider testified he attended the meeting of the cap medical Executive Committee where doctors Goracke, Swayze and Thomas decided to terminate Dr. Vesom before there was any discussion of the basis on which he should be terminated.  AplApp. at 1295.

- Dr. Rider testified that as a member of the Medical Executive Committee, he attended a meeting on February 18, 2003, also attended by Andy Ramirez, the attorney for Atchison Hospital Association, who advised the members of the Medical Executive Committee that they could get rid of Dr. Vesom with immunity if they shrouded their acts in the cloak of the hospital bylaws description of a "disruptive physician." AplApp. at 1295.

- Dr. Rider testified that at the February 18, 2003 meeting of the Medical Executive Committee there was never a discussion of what behavior of Dr. Vesom was disruptive or violated hospital bylaws; rather, the cap medical Executive Committee merely voted to terminate Dr. Vesom for being "disruptive.  AplApp. at 1295.

Obviously, the statements and behaviors of the chief executive officer of the Hospital and the three individual defendants [Goracke, Swayze and Thomas] are not inadmissible hearsay; rather the testimony of Dr. Rider and Dr. Ware regarding their statements and behaviors are admissible as admissions.  **FRE 801(d)**. The District Court plainly was wrong in refusing to consider this evidence.  Because it is impossible to ascertain from the District Court's opinion what portions of the relevant declarations were ignored (other than the statement that the trial court ignored virtually all of Dr. Ware's declaration) a determination of the significance of the District Court's refusal to consider admissible and highly relevant evidence cannot be made.

### Did The District Court Err In Refusing To Consider Documentary Evidence From Vesom's Credentials File As "Unauthenticated," Which Documents Were Produced In Discovery Which Were Contained In Records Maintained By AHA For Purposes Of Credentialing Vesom?

The District Court refused to consider the documents produced by defendants in discovery from Vesom's Credentials File on the grounds that Vesom failed to properly authenticate those records.  Appendix at 425-26.  In particular,

the trial court indicated that, at the very least, the handwritten notes appearing in Vesom's Credentials File do not meet the necessary authentication standards. Without specifying which of those documents the lower court was refusing to consider, the District Court that she may not consider those documents in resolving the summary judgment issue.

The evidence presented in opposition to a motion for summary judgment need not be in a form that would be admissible at trial if the content and substance of the evidence is admissible. *Pastran v. K-Mart Corp.*, **210 F.3d 1201, 1204 (10th Cir. 2000).** In this instance, the District Court refused to consider relevant evidence produced from the defendants' own file concerning Vesom on the grounds that plaintiff failed to properly authenticate the records with sworn testimony. In the Final Pretrial Order, the parties stipulated that documents contained in the Credentials Files of Dr. Vesom, Dr. Swayze, Dr. Goracke, Dr. Thomas, Dr. Rider and Dr. Jones were business records within the scope of FRE 803(6) and could be introduced in evidence during trial without further foundation, subject to objections based solely on grounds of relevancy. Appendix at 239-41. It was clearly error for the District Court to refuse to consider these records in ruling on defendant's motion for summary judgment.

The refusal to consider these records cannot be deemed harmless, given their probative strength on the issues of discrimination and pretext.  See, e.g. AplApp. at 1182-1277 and 1283-1291.

## Did The District Court Err In Rejecting And Failing To Recognize Compelling Evidence Of Pretext?

Defendants rely on provisions of the Acthison Hospital Association  Bylaws relating to conduct characterized as "disruptive" as justification for the termination of the medical staff privileges of Dr. Vesom.   However, utilization of such provisions is often used to mask sham peer-review and as a pretext for race discrimination.   See, e.g., Affidavit of John Henry Pfifferling [Doc. No. 75].  Public policy prohibits a hospital from using the "disruptive physician" language in it's Bylaws to sanction a physician who is asserting arguments intended to improve patient care or patient care issues.   As the Court observed in *McElhinney v. William Booth Memorial Hospital*, **544 S.W. 2d 216, 218 (Ken. S.Ct. 1976)**:

> The goal of providing high standards of medical care requires that physicians be permitted to assert their views when they feel that treatment of a patient is improper or that negligent hospital practices are being followed.  Considerations of harmony in the hospital must give way where the welfare of patience is involved, and a physician by making his objections known, whether or not tactfully done, should not be required to risk his right to practice medicine.

Likewise, in *Nanavati v. Burdette Tomlin Memorial Hospital,* **526 A.2d 697, 703-04 (N.J. Sup. Ct. 1987)**, the Court held:

Doctors, like other people, have quirks, and some doctors are more disagreeable than others. The mere fact that a doctor is irascible, however, does not constitute good cause for termination of his or her hospital privileges. [Citing authorities]. Nor should allegations of "disharmony" ever be used as a ruse to deny or terminate staff privileges because of a doctor's race, religion, color, or gender. Likewise, a doctor should not be cut off from staff membership merely because he or she has criticized hospital practices or other doctors. [Citing authorities (valid and constructive criticism of hospital practices should not be equated with potential disharmony)]. Constructive criticism of an incompetent physician, like criticism of an unsafe or inefficient hospital practice, protects both the public and the hospital. So strong is the public interest in open communications involving "matters directly affecting the quality of health care" that otherwise defamatory statements by one staff physician about another may be privileged.

Likewise, complaints of a staff physician regarding unlawful discrimination are protected oppositional activity under 42 U.S.C. §1981 and may not be used as a justification for the termination of staff privileges. See, e.g., *Maldonado v. City of Altus*, 435 F.3d 1294 (10th Cir. 2006); *O'Neal v. Ferguson Construction Co.*, 237 F.3d 1248, 1258 (10th Cir. 2001).

In this case, virtually all of the alleged "disruptive" activity of Dr. Vesom centered on his attempts to improve the quality of health care at the Hospital, or his complaints that he was being discriminated against because of his race by the Hospital administration. As a matter of law and public policy, the defendants may not resort to unfounded allegations of disruption in the circumstances to terminate Dr. Vesom's medical staff privileges.

**Did The Trial Court Err In Granting Summary Judgment On Vesom's Sherman Act Claim?**

The District Court held that because the Board of Directors was the ultimate decision-maker with respect to the termination of Dr. Vesom's staff privileges, it could not have conspired to interfere with Dr. Vesom's business. Opinion at 46. First, there is significant evidence that the Fair Hearing Panel and the Board of Directors exercised no real authority over the determination to terminate Vesom; rather they acted perfunctorily. See, e.g. *EEOC v. DCI Coca Cola*, **450 F.3d 476-484-86 (10th Cir. 2006).**

Moreover, there is ample evidence in the record to make a jury triable issue on the Anti-trust claim. Defendant's assertion that the defendants' actions are exempt from the Sherman Act under the "state action" doctrine is ludicrous. Defendant does not suggest that the State of Kansas has the authority to overturn any "peer review" activity of Atchison Hospital Association, a private corporation; accordingly, the state action immunity from antitrust liability does not apply. *Patrick v. Burget* **486 U.S. 94 (1988).**

Plaintiff agreed with defendants that the denial of staff privileges for valid reasons cannot be an antitrust violation. However, denial of staff privileges for the purpose of diminishing the competition for services in the Atchison community, as reflected in the evidence in this case, is prohibited anticompetitive activity which violates Sherman I. The four elements of a Sherman I violation articulated on page

123 of defendants' brief plainly are satisfied by the record in this case.  There is little question that the testimony of Dr. Rider established concerted actions of defendants to drive Dr. Vesom from the community [or back to Thailand as some agents of the Hospital suggested]; the concerted actions produced an anti-competitive effect implicating interstate commerce; the concerted actions were plainly illegal; and Dr. Vesom was injured by being driven from a practice he had developed over a period of more than 20 years.

The grant of  summary judgment on the Sherman Act claim must be reversed.

## Did The Trial Court Err In Granting Summary Judgment On Vesom's State Law Whistleblower Retaliation Claim On The Grounds That He Was An Independent Contractor?

The District Court held as a matter of law that an independent contractor cannot avail himself or herself of the protections of the public policy exception under Kansas law for whistleblowing.  This decision does not contain any analysis of the public policy distinction between protecting employee whistleblowers and those who provide employee –like services for corporate employers.

Citing *Zinn v. McKune*, **949 F. Supp. 1530, 1537–38 (D. Kan. 1996**), defendants argue that the public policy protecting whistleblowers does not extend to Dr. Vesom, as an independent contractor.  The plaintiff in *Zinn* was not an employee of the defendant and had no relationship with the defendant as an independent

contractor.  The rationale for the Court's holding was that the protections of public

policy would not be extended to a person who had no relationship with defendant.

The Court held:

> Thus, because there is no evidence that any of the defendants had the
> power to hire or fire the plaintiff, the court concludes that, based on
> the facts alleged, the Kansas Supreme Court would not extend the tort
> of whistle-blower retaliation to the defendants.
> **949 F.Supp. at 1538.**  Of  course, it makes no sense to extend
> whistleblower protection to an individual who "blows the whistle" on
> an entity which has no power or authority to affect the economic
> interest of a party making the complaints.   Unlike Zinn, the
> defendants in this case did wield economic power over plaintiff and
> most certainly had the authority and the power to terminate his 20+
> year practice of medicine in the community of Atchison, and they did.
> Public policy dictates that persons and entities should not be allowed
> to act with impunity to stifle complaints  about unlawful or unethical
> conduct through economic force.

Dr. Vesom has offered evidence that the medical staff physicians at

Atchison Hospital performed the same services for the Hospital as employees

under the same regulatory scheme.  Public policy encourages reporting of conduct

contrary to the public interest, whether the reporting is done by an employee or an

independent contractor.

In ***Wabaunsee County v. Umbehr***, **518 U.S. 668 (1996),** the Supreme Court

affirmed the Tenth Circuit's holding that independent contractors are entitled to

protection from termination of their contracts based on the exercise of First

Amendment rights.  The holding in that case in instructive:

We therefore see no reason to believe that proper application of the Pickering balancing test cannot accommodate the differences between employees and independent contractors.    There is ample reason to believe that such a nuanced approach, which recognizes the variety of interests that may arise in independent contractor cases, is superior to a bright-line rule distinguishing independent contractors from employees.    The bright-line rule proposed by the Board and the dissent would give the government carte blanche to terminate independent contractors for exercising First Amendment rights.   And that bright-line rule would leave First Amendment rights unduly dependent on whether state law labels a government service provider's contract as a contract of employment or a contract for services, a distinction which is at best a very poor proxy for the interests at stake. See Comment, Political Patronage in Public Contracting, 51 U. Chi. L.Rev. 518, 520 (1984) ( "[N]o legally relevant distinction exists between employees and contractors in terms either of the government's interest in using patronage or of the employee or contractor's interest in free speech"); cf. Perry, 408 U.S., at 597, 92 S.Ct., at 2697 (the prohibition of unconstitutional conditions on speech applies "regardless of the public employee's contractual or other claim to a job").   Determining constitutional claims on the basis of such formal distinctions, which can be manipulated largely at the will of the government agencies concerned, see Logue v. United States, 412 U.S. 521, 532, 93 S.Ct. 2215, 2222, 37 L.Ed.2d 121 (1973) (noting that independent contractors are often employed to perform "tasks that would ... otherwise be performed by salaried Government employees"), is an enterprise that we have consistently eschewed. . . .

. . . . Independent contractors appear to us to lie somewhere between the case of government employees, who have the closest relationship with the government, and our other unconstitutional conditions precedents, which involve persons with less close relationships with the government.    The Board's and the dissent's assertion, post, at 2362, that the decision below represents an unwarranted "extension" of  *681 special protections afforded to government employees is, therefore, not persuasive.

**518 U.S. at 678-81.**

Defendants argue as a matter of law, independent contractors are not entitled to the protections of public policy, regardless of the factual similarity between the independent contractors and employees in the case at issue. ***Wabaunsee County*** teaches that this issue may not be resolve as a matter of law in a fact vacuum. Resolution of this on summary judgment is inappropriate because no factual record has been developed, nor have defendants offered any evidence that the relationship between independent staff physicians and employed staff physicians is functionally different.

***Parsells v. Manhattan Radiology Group,*** **255 F. Supp. 2d 1217 (D. Kan. 2003)** is not a case contrary to this principle.   In that case, Judge Lungstrum, relying principally on cases interpreting various statutes conferring whistleblower protection on "employees" only, questioned whether plaintiff's whistleblower claim under Kansas law was viable for an independent contractor.   He asked plaintiff for briefing on the subject.  **255 F.Supp.2d at 1237.**   A review of the Court record in that case reveals that plaintiff filed his Memorandum of Law supporting his whistleblower claim on April 14, 2003 [Doc.No. 91].  Rather than dismiss the case, Judge Lungstrum set the case for trial by order dated April 22, 2003 [Doc.No. 93], and it apparently settled.  See Docket entries in Case No. 02-2008.  Parsells is not authority for the proposition defendant asserts—that in no

case is an independent contractor entitled to whistleblower protection under the Kansas Common Law.

Defendants argue that they were not aware of the KDHE complaint at the time Dr. Vesom's privileges were terminated. The Declaration of Dr. Ware and Pl.Ex. No. 5 provide substantial evidence that the members of the Medical Executive Committee knew the complaints about the standard of care and peer review at Atchison Hospital Association by Dr. Vesom and Dr. Ware were headed to the KDHE.

Finally, citing *Polson v. Davis,* **895 F.2d 705 (10th Cir. 1990)**, defendants argue that there is an adequate statutory remedy available to plaintiff to vindicate his allegations of retaliatory discharge for whistleblowing. In *Polson* the plaintiff's claim of whistleblowing involved the allegation that he complained of discrimination in violation of the Kansas Act Against Discrimination. Because that statute had its own remedial provisions, the Tenth Circuit held that the additional protections of the public policy exception were unnecessary and unavailable.

The whistleblowing allegation in the instant case involves complaints of substandard medical care and inadequate peer review at the Hospital which endangered the public health and welfare. There is no statutory scheme which protects individuals who lodge such complaints with public officials or upper

management of the institution.  Accordingly, the rule in **Polson** is inapplicable in

this case.

### Did The Trial Court Err In Granting Summary Judgment On Vesom's Claim Of Intentional Interference With Business Relations On The Grounds There Was Insufficient Evidence That Plaintiff Enjoyed A Business Relationship Or Expectancy With His Patients In Atchison?

The District Court granted summary judgment of Vesom's claim that the

termination of his medical staff privileges interfered with his business relations

with the  thousands of patients he had treated in the over 20 years he practiced in

Atchison.  Apparently, the District Court grounded its decision on the fact that

evidence of the existence of a thriving practice is insufficient unless Vesom could

demonstrate he has and exclusive arrangement with his patients.  The District

Court makes the incredible assertion that because Vesom could have admitted

patients in Horton County and Leavenworth, he could have continued to practice in

Atchison without any impairment to his practice.  Indeed, the District Court,

without any evidence to support the conclusion, finds that Vesom's move to Poplar

Bluff was "voluntary."

Other than a recitation of the elements of the tort and the blanket statement

that plaintiff cannot make out a prima facie case, defendants' argument is

completely void of substance.  It is the burden of the moving party to show that

there is no genuine issue of fact for trial—not just state the plaintiff cannot make a

prima facie case.  Plainly, plaintiff had a thriving medical practice which was destroyed by defendants' intentional and unlawful misconduct.  This point is wholly unsupported by defendants' moving papers, and the Court's decision is unsupported by the record and the law.

**Did The Trial Court Err In Granting Summary Judgment on All Claims On The Grounds That A Waiver Of Claims Contained In Vesom's Application For Renewal Of His Medical Privileges In 2003 Barred Claims Based On Subsequent Violations Of Federal Anti-Discriminatory Statutes, The Sherman Act And State Law Intentional Torts?**

The defendants argue (and the District Court held that Dr. Vesom's antecedent execution of the papers necessary to reapply for his medical staff privileges on December 15, 2002, which included a liability waiver, constitutes a release of liability for defendants' subsequent violations of statute and  intentional torts.  See Opinion at 53-56.

Neither the defendants nor the District Court cite any authority for the proposition that a prospective waiver of intentional torts or statutory violations is valid. The Court's reliance on *Torrez v. Pub. Srv. Co*, 908 F.2d 687 (10th Cir. 1990), *Sanford v. Crane,* 382 F.3d 1175 (10th Cir. 2004), *Mazzoni Farms, Inc. v. DuPont De Neours & Co*. 761 So. 2d 306, and *Bennett v. Coors Brewing Co,* 189 F.3d 1221 (10th Cir. 1999) are all inapposite because they involved a release of past intentional torts and past acts of discrimination.  It would be a strange rule indeed if an applicant for employment could sign an enforceable release at the

outset which would empower the employer to batter the employee with impunity or violate the employee's federally protected rights.

Obviously, any release of claims must be knowing and voluntary, and a party may not release another from liability for intentional conduct which is yet to occur.

The defendants cite no case which involves the termination of medical staff privileges. Each of the authorities cited by defendants involves a release of contract claims against professional associations which certify medical professionals in medical specialties. Indeed, even the authorities cited by defendants hold that a liability waiver is ineffective against intentional tort claims or federal statutory violations. See, e.g. *Balaklaw v. American Board of Anesthesiology, Inc*., **149 Misc. 2d 11, 562 N.Y.S.2d 360, 362 (N.Y. 1990)**(considering the validity of a tort claim against the agency and denying that claim for a lack of supporting evidence—not the liability waiver) and *Sanjuan v. American Board of Psychiatry & Neurology,* **40 F.3d 247, 250 (7th Cir. 1994)**(holding that federal statutory claims, such as a claim under the Sherman Act, are unaffected by an antecedent liability waiver).

A release which purports to waive claims which may arise in the future for violations of statutory obligations or intentional torts is void because it is against public policy. Although parties with substantially equal bargaining power may

waive prospective claims for breach of contract or negligence in the performance of a contract, public policy prohibits a party from licensing another to violate statutes enacted for the public good or otherwise committing intentional wrongs. A waiver of claims arising from violations of the various federal civil rights laws is absolutely void. ***Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51-52 (1974); *U.S. v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826, 856-57 (5th Cir 1975); *Rogers v. General Electric Co.*, 781 F.2d 452, 454 (5th Cir. 1986)**. Moreover, public policy prohibits the prospective waiver of any claim for intentional wrong, including claims based on intentional torts. ***Mazzoni Farms, Inc. v. E.I. DuPont & Co.*, 761 So.2d 306, 312 (Fla. 2000); *Hatch v. V.P. Foundation,Inc.*, 990 S.W.2d 126, 140 (Mo. App. 1999); *Reece v. Finch*, 562 So.2d 195, 198-99 (Ala. 1990); *Elmer v. Coplin*, 485 So.2d 171, 177 (La. App. 1986)**.

Each of plaintiff's six claims is predicated upon a violation of a federal statute, an intentional tort or a violation of public policy. As such, each claim cannot by waived prospectively.

<u>CONCLUSION</u>

For the foregoing reasons, Bryant submits that the Judgment of the District Court should be reversed and the case remanded to the District Court with instructions to deny Farmers' Motion for Summary Judgment and to reinstate this case for trial.

<u>REASON ORAL ARGUMENT IS NECESSARY</u>

This matter is fact intensive, and Appellant believes the interactive process of oral argument will assist the Court in eliminating issues, focusing on the significant legal and factual issues and reaching a just result.

<u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of F.R.A.P. 32(a)(7)(B) because this brief contains 12,343 words, excluding the parts of the brief exempted by F.R.A.P. 32(a)(7)(B)(iii).

2.    This brief complies with the type face requirements of F.R.A.P. 32(a)(5)and the type style requirements of F.R.A.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in font size 14 and type style Times New Roman.

Respectfully submitted,

Charles D. Kugler Ks. No. 7031
748 Ann Avenue
Kansas City, KS 66101-3014
913-371-1930
FAX: 913-371-0147

<u>/s/ Michael J. Gallagher</u>
Michael J. Gallagher #70617
700 Peck's Plaza
1044 Main Street
Kansas City, MO 64105
(816) 471-4500
FAX: (816) 221-7886

mjgallagh@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2007 I electronically filed the foregoing with the clerk of the Clerk of the Tenth Circuit Court of Appeals and sent as an attachment a copy of the foregoing by email to Mark A. Ferguson, Andrew R. Ramirez and Adam T. Suroff, Lathrop & Gage L.C., Building 82, Suite 1000, 10851 Mastin Boulevard, Overland Park, KS 66210-1669.

/s/ Michael J. Gallagher